**JEFFREY K. STARNES**
**THOMAS K. GODFREY**
**Assistant U.S. Attorneys**
**U.S. Attorney's Office**
**P.O. Box 3447**
**Great Falls, MT 59403**
**119 First Ave. N., Suite 300**
**Great Falls, MT   59401**
**Phone: (406) 761-7715**
**Fax: (406) 453-9973**
**E-mail:   Jeff.Starnes@usdoj.gov**
**            Thomas.Godfrey@usdoj.gov**

**ATTORNEYS FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**RICHARD LEE ROGERS**<br><br>Defendant. | CR-23-112-BLG-SPW<br><br>**TRIAL BRIEF** |

## INTRODUCTION

Rogers is charged by superseding indictment with three federal felonies stemming from threats and harassing phone calls that he made between December

1

2021 and February 2023.

Superseding count 1 alleges that on February 3, 2023, Rogers issued a threat to injure and murder a member of the United States Congress in violation of 18 U.S.C. § 115(a)(1)(B) and (b)(4).  If convicted of issuing a threat to murder, Rogers faces a maximum penalty of 10 years of imprisonment, a $250,000 fine, and three years of supervised release, and if convicted of threatening to assault, he faces a maximum penalty of six years of imprisonment, a $250,000 fine, and three years of supervised release.

Superseding count 2 alleges that Rogers made repeated harassing phone calls the Speaker's office on February 3, 2023, in violation of 47 U.S.C. § 223(a)(1)(E).  Superseding count 3 alleges that Rogers made repeated harassing phone calls to the FBI's National Threat Operations Center between December 2021 and October 2022.  If convicted of count 2 or count 3, Rogers faces a maximum penalty of two years of imprisonment, a $250,000 fine, and one year of supervised release on each count.

Rogers pleaded not guilty to all charges.  Trial is scheduled to begin on September 30, 2024.

## ELEMENTS

To prove the defendant guilty of the charges in the superseding indictment,

the United States must prove each of the following elements beyond a reasonable doubt.

**Count 1 – Threatening to Murder or Assault a Member of Congress, 18 U.S.C. §§ 115(b)(4), (c)(4)**

- First, the defendant threatened to injure and murder a United States Official;

- Second, the defendant did so with intent to retaliate against the United States Official on account of the performance of his official duties; and

- Third, the defendant acted recklessly in transmitting the threat, that is with a conscious disregard for the substantial and unjustifiable risk that others could regard the statements as threatening violence. [1,2]

**Counts 2-3 – Harassing Telephone Calls, 47 U.S.C. § 223(a)(1)(E)[3]**

- First, the defendant made telephone calls in interstate or foreign communications;

- Second, the telephone calls were repeated;

- Third, during the telephone calls some conversation ensued; and

---

[1] For Elements 1 and 2, *see* Ninth Circuit Model Criminal Instruction 8.15 (2022 Edition – *Updated June 2024*).   See also See United States v. Orozco-Santillan, 903 F.2d 1262, 1265 (9th Cir. 1990)*, overruled on other grounds recognized by United States v. Hanna,* 293 F.3d 1080, 1088 n.5.

[2] For element 3, *see Counterman v. Colorado*, 600 U.S. 66, 73 (2023):
"the State must prove in true-threats cases that the defendant had some understanding of his statements' threatening character. The second issue here concerns what precise mens rea standard suffices for the First Amendment purpose at issue. Again, guided by our precedent, we hold that a recklessness standard is enough."

[3] *See* 2B Fed. Jury Prac. & Instr. § 69:03 (6th ed.).

3

- <u>Fourth</u>, the defendant made repeated calls solely to harass the person at the called number.

## PLEA CONSIDERATIONS

The United States notes that the government offered the defendant a formal plea agreement before seeking a superseding indictment that would have allowed the defendant to plead guilty to Count 2 – Harassing Phone Calls. The defendant rejected the United States' plea offer and the United States ultimately obtained a superseding indictment that added Count 3 to the charges Rogers now faces. For the record, the United States believes that a plea of guilty would be more beneficial to the defendant than a conviction following trial. *See Missouri v. Frye*, 132 S. Ct. 1399 (2012).

## LENGTH OF TRIAL AND WITNESSES

The United States anticipates calling approximately seven witnesses. Its case-in-chief should take approximately one and one-half days after jury selection, subject to cross-examination.

## ANTICIPATED PROOF

Rogers' crimes can be separated into two primary courses of conduct. First, on February 3, 2023, Rogers made repeated and harassing phone calls to staff members who worked for the Hon. Kevin McCarthy, then Speaker of the

United States House of Representatives. During one of those calls, he issued a threat to injure and kill the Speaker. Second, in addition to the harassing and threatening calls placed to the Speaker's office, Rogers placed at least 150 harassing calls to telephone operators at the FBI's National Threat Operations Center ("NTOC") between December 31, 2021, and October 13, 2022.

On February 3, 2023, the U.S. Capitol Police received a report from Speaker McCarthy's office advising they had received a high volume of phone calls from defendant Rogers. In the calls, Rogers identified himself and said that he resided in Billings, Montana. U.S. Capitol Police later queried the call records for the office and identified the phone number used as 406-855-3892, which they confirmed as being associated with Rogers.

One of the staff members who spoke to Rogers was Staff Aide Payson Thomas. Mr. Thomas reported that the calls consisted of Rogers harassing and swearing at the employees who were answering calls in the Speaker's office that day. According to Thomas, Rogers stated that his calling the office was his "form of civil disobedience" and his "form of protest," and that he would continue to call until something was done about the "balloon," referring to a suspected Chinese spy balloon observed floating over Montana and the rest of the United States that week. Thomas reported that Rogers' comments were at first sexual in nature,

5

telling the employees to "suck his dick" and that he would "put his dick in them" and the Speaker.

At one point, Rogers stated, referring to the Speaker, "I'm gonna fucking kill him for not shooting down the Chinese balloon." Mr. Thomas was confident those were the words used and interpreted the comment as Rogers intending to kill or injure the Speaker. Mr. Thomas stated that due to Rogers' high volume of calls on February 3, the Speaker's office decided to disengage their public access line. When staff members returned to the office on Monday, February 6, they observed that Rogers continued to call that morning. The office again decided to disengage the public access line that afternoon as well.

Mr. Thomas was concerned enough about Rogers' threatening statement to report the incident to the U.S. Capitol Police. He made the report by filling out a threat assessment form and emailing it to US Capital Police. In the report, Thomas wrote down the phone number as 406-875-2892.

At approximately 10:13 (EST), Special Agent David Logan, USCP, reviewed the threat report submitted by Payson Thomas. At approximately 11:48 am (EST), SA Logan submitted an emergency disclosure request to Nemont Telephone for subscriber information on the target number: 406-875-2892, the number that Thomas placed threat report. However, SA Logan learned that the

6

reported target number is a number held by Nemont as a landline but that it has never been assigned or used by a customer as according to their records. At approximately 12:28 pm (EST), SA Logan spoke with Payson Thomas who confirmed the listed name, city, state, partial address, and statement of concern were all accurate but conceded that he may have misunderstood the phone number provided by the caller. Thereafter, SA Logan conducted various records checks on the information provided by Thomas and learned that a Richard Rogers, with an address in Billings, Montana, had a phone number of 406-855-3892 that was serviced by AT&T.

At approximately 2 pm (EST), SA Logan contacted AT&T's Global Legal Demand Center and obtained toll records for phone number 406-855-3892. Toll records showed that number made dozens of calls to Speaker McCarthy's Office on February 3, 2023. Thereafter, SA Logan caused a lead to be sent to the FBI in Montana for further investigation.

FBI Special Agent Matthew Deurmeier assumed responsibility for the investigation into defendant Rogers. SA Deurmeier was aware of Rogers and had prior contact with him due to Rogers repeatedly calling the FBI's NTOC. On October 13, 2022, SA Deurmeier spoke with Rogers regarding his numerous calls

7

to NTOC. The phone call was recorded and lasted 11 minutes and 33 seconds.[4] During the call, Rogers admitted to calling the NTOC "thousands of times" and expressed anger with various political officials. SA Deurmeier asked if he should be concerned for Rogers' mental well-being, but Rogers responded by expressing his disdain for the federal government.

Following that call, Rogers began to repeatedly text message SA Deurmeier at his work cell phone. Between October 2022 and September 2023, Rogers sent hundreds of text messages to SA Deurmeier, most of which were unsolicited, to express his opinions about various subjects. On several occasions, Rogers used obscenities and vulgar language towards SA Deurmeier, which were consistent with Rogers' communications with the Speaker's office and NTOC. Examples of the text messages include:

- 12/21/22: "I for one do not honor your authority and imagine that not many others will either. Bring an elected official when you come to pick me up... Your badge doesn't work anymore. Its broken"

//

//

---

[4] The United States does not intend to play this recording during its case-in-chief because SA Deurmeier and Rogers discuss Rogers's calling entities other than Speaker McCarthy and the NTOC, including the Montana Governor's Office as well as the offices of other elected representatives. Instead, the United States intends to have SA Deurmeier testify to the portion of the interview that is relevant to the NTOC calls as charged in Count 3.

- 01/04/23:  "Scumbag McCarthy is just learning that we will watch Dummycrats [bum] the Country to the ground before voting establishment GOP again... We'll expedite the disintegration of the Banana Republic that is the U.S.A. Don't know, don't care! SORRY, NOT SORRY... WE THE PEOPLE REFUSE TO COMPLY WITH TYRANNICAL RULE- UH-OH!"

- 01/16/23:  "Tired of being a laughing stock yet?  Don't worry, we're banning the FBI! Soon you'll be able to suck at a whole new job"

- 02/12/23: "Just because I intentionally act in an audacious manner to make a point, doesn't mean I'm unstable or need medication... Self-awareness is an amazing thing..."

Upon receiving the lead regarding Rogers's calls to Speaker McCarthy's Office on February 3, 2023, SA Deurmeier obtained the phone records for 406-855-3892 via grand jury subpoena.  The toll records show that phone number 406-855-3892 was registered to subscriber Laurie Rogers, defendant Rogers' spouse, with an address in Shepherd, Montana.  The records also show that phone number 406-855-3892 called Speaker McCarthy's office in Washington, DC, approximately 147 times in 75 minutes on February 3, 2023.  Moreover, the records show that Rogers contacted the FBI's NTOC over 100 times between December 2021 and October 2022.

Upon request of the United States, NTOC identified 150 recorded calls that were attributed to defendant Rogers.  During many of these calls, Rogers provided his name, date of birth, phone number, city, state, and zip code when

9

speaking to the operators. Rogers' behavior with the NTOC operators, who are employed by the FBI but not as Special Agents, in many instances, consisted of his yelling, berating, being uncooperative, and using obscenities towards the employees. He often placed several calls during a short period of time. During several of the calls, NTOC operators informed Rogers that they were terminating the call because he was being abusive and harassing. In one call on September 22, 2022, Rogers told the NTOC employee "Fuck you bitch. Suck my dick."

NTOC Threat Intake Supervisor Patrick McGahan will explain to the Court and the jury what NTOC is, where NTOC is, how it operates, and the standard procedure for answering calls and disseminating information for further investigation by the FBI.

Additionally, on August 8, 2022, Deputy Kevin Jam, Yellowstone County Sheriff's Office, received a request from NTOC to contact Rogers for a mental welfare check due to erratic statements Rogers made to NTOC. Deputy Jam spoke with Rogers by phone that day.

### ANTICIPATED EXHIBITS

1. 150 recorded phone calls placed to NTOC between December 31, 2021, and October 13, 2022;

2.  Email from Payson Thomas to US Capitol Police on February 3, 2023;

3.  Rogers' Phone Records on February 3, 2023;

4.  Rogers Phone Records Showing Calls to the NTOC Between December 2021 and October 2022;

5.  Rogers' Text Messages with FBI

## ANTICIPATED WITNESSES

1.  Payson Thomas

2.  David Logan, U.S. Capitol Police

3.  Matthew Deurmeier, Special Agent, FBI

4.  Patrick McGahan, NTOC Threat Intake Examiner

5.  Kevin Jam, Deputy, Yellowstone County Sheriff's Office

6.  Semeon Charles, AT&T Records Custodian

7.  Kevin Cooks, Montana Highway Patrol

## ANTICIPATED LEGAL ISSUES

**I.   The Defendant's statements to others are non-hearsay and admissible into evidence.**

Rule 801(d)(2) defines a party opponent's statement as non-hearsay, meaning it can be admitted as substantive evidence.  Fed. R. Evid. 801(d)(2). This evidence, which is any statement made by a defendant, is admissible as a result of the "adversary system."  *Advisory Committee Notes*, Fed. R. 801(d)(2).

11

The party-opponent rule has enjoyed the "freedom" from the strict requirements that other rules might require, such as expert testimony. The courts should instead give "generous treatment" of such statements and admit them into evidence. *Id.*

## II. Other crimes, wrongs, or acts evidence (Fed. R. Evid. 404(b)).

As a general rule, evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Fed. R. Evid. 404(b)(1). However, such evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident, provided, in a criminal case, the prosecution provides reasonable notice of its intent to use such evidence. Fed. R. Evid. 404(b)(2).

In this case, the Court has previously ruled that Rogers' text message communications with FBI Special Agent Deurmeier are admissible under Rule 404(b) in order to prove his motive, intent, and plan to harass. *See Court's Order on Defense Motions in Limine* (Doc. 89) at 15-17.

## III. The Threat Report/Email from Payson Thomas to the U.S. Capitol Police is admissible as a present sense impression under Fed. R. Evid. 803(1).

Present sense impressions are governed by Fed. R. Evid. 803(1). That rule

states, "A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it [is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness]." Fed. R. Evid. 803(1).   In order to be considered a present sense impression, a statement has to be "nearly contemporaneous with the incident described and made with little chance for reflection." *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995). The declarant must also have personal knowledge of the events described in the present sense impression. *Id.* at 1373.

Here, after terminating the call with Rogers in which Rogers issued the threat, Payson Thomas drafted a threat report and sent it to the U.S. Capitol Police. The drafting of this report was shortly after the call and was thus "nearly contemporaneous."   Accordingly, the report is a present sense impression and is therefore not hearsay.

Moreover, as the author of the email, Payson Thomas is the declarant and is expected to testify to the report's contents and will be subjected to cross-examination.   Thus, eliminating any concern that the statements in the report come from an unreliable out of court declarant.

//

//

## IV.  Judicial Notice

A "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).   The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).   "The court may take judicial notice at any stage of the proceeding." Fed. R. Evid. 201(d). See Trigueros v. Adams, 658 F.3d 983, 987 (9th Cir. 2011).   "On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed." Fed. R. Evid. 201(e).    In a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive. Fed. R. Evid. 201(f).

In this case, the United States asks the Court to take judicial notice of that Coordinated Universal Time, abbreviated as UTC, is the primary time standard by which the world regulates clocks and time, and that local time on the east coast of the United States is five hours behind UTC during winter but four hours behind while daylight savings is observed.   A version of this instruction was given to a federal jury in Great Falls on September 19, 2024, in *United States v. Malatare*, Cause No. CR 23-80-GF-BMM (Final Instruction No. 30, Doc. 85-1.   The court

14

adopted the instruction from *United States v. Michael*, 664 Fed. Appx. 32, 36 (2d Cir. 2016) (unpublished), which upheld an the following instruction given by the court in that case: "Local time on the east coast of the United States is five hours behind UTC during winter but four hours behind while daylight savings is observed."   Such an instruction here is relevant and proper because phone logs show call times in UTC.   The difference between UTC and time in various time zones can be readily determined from sources whose accuracy cannot be questioned.   *See, e.g.,* National Oceanic and Atmospheric Administration, U.S. Department of Commerce, *Z-time (Coordinated Universal Time),* available at https://www.noaa.gov/jetstream/time (last accessed September 23, 2024). According to NOAA, UTC is also referred to as "Zulu time" or "Z-time" for short.

V. **Toll Records Obtained From AT&T are Reliable and Relevant Evidence Showing Rogers Placed a High Volume of Calls to Both the Speaker's Office and the NTOC**

In response to law enforcement inquiry, AT&T produced phone call records, commonly referred to as toll records, on a phone number associated with defendant Rogers.   AT&T also produced a key to help readers interpret the records.   In ruling upon the defense's motion in limine, the Court expressed concern about the

15

potential reliability of the records, given a statement in the key and seeks to clarify these records at the final pretrial conference in this case.   *See* (Doc. 89) at 9-10.

For the Court's and the defense's awareness, attached to this brief is a page from the relevant portion of the AT&T Key that was produced along with the toll records.   In the section called "Report Differences," the key notes the following:

> Because calls can traverse many networks, AT&T provides records of all calls that traverse its wireline, wireless and international gateways.
>
> ReportAU- Calls that traverse the mobility network.
> ReportLandline- Calls that traverse the wireline and Voip network.
> ReportICDR-Calls that traverse AT&T's international gateway.
> ReportSTIR – Calls that have gone through attestation process to authenticate Caller ID.
>
> A call may show up on one or more report however AT&T has no ability to definitively state or correlate calls as being the same transaction. You may infer any conclusions based on your own analysis of the records.

In this case, both Special Agent Logan with USCP and Special Agent Deurmeier with the FBI obtained phone records from AT&T.   Logan obtained records via emergency disclosure request and SA Deurmeier obtained the records via Grand Jury subpoena.   In response to each request, AT&T produced multiple reports – including ReportAU, ReprtLandline, ReportICDR, and ReportsSTIR. As the United States understands it, AT&T operates several networks – its mobility network, its landline/VOIP network, and its international network.   And, when a

caller places a single call, it is possible for that call to transit across more than one network. Thus, the same call may be captured in more than one report. According to the prosecution's reading of the key, AT&T cautions that seeing a call listed in multiple reports does not necessarily mean that more than one call was placed, it could mean that one call simply transited across more than one of AT&T's networks. This is likely to guard against an improper conclusion that because one AT&T report shows phone number 1 called phone number 2 ten times on a particular date and another report shows phone number 1 called phone number 2 five times on that same date, it does not necessarily mean that 15 calls were placed. It could mean that only ten calls were placed, but five of those calls transited across more than one of AT&T's networks.

Here, AT&T produced reports from its mobility network and its Landline/VOIP network that both show Rogers' phone number placing a large number of calls to NTOC between December 2021 and October 2022, as alleged in Count 3, as well as a large number of calls placed to the Speaker's Office on February 3, 2023, as alleged in Count 2. The precise number of calls he placed in each instance does not matter since the government is not required to show an exact number of calls; however, showing a large volume of calls is a key

17

component to the prosecution's case since the volume of calls could, in and of itself, be considered harassing.

Following the Court's order on the defense motion in limine, the prosecution subpoenaed a custodian of records from AT&T; however, the United States does not believe it will have time to speak with that witness directly before the deadline for submitting its trial brief.   If the United States learns information that is different from its understanding of the phone records as stated herein, the prosecution will supplement this portion of its trial brief.

Respectfully submitted this 23rd day of September 2024.

JESSE A. LASLOVICH
United States Attorney

*/s/ Jeffrey K. Starnes*
*/s/ Thomas K. Godfrey*
Assistant U.S. Attorneys
Attorneys for Plaintiff